**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 |
| | ) | |
| ANDREA D. WILLIAMS, | ) | Case No. 18-16866 |
| | ) | |
| Debtor. | ) | Hon. Daniel R. Fine |

**SPECIAL COUNSEL'S REPLY IN FURTHER SUPPORT OF HIS OBJECTION TO
THE DJC LAW, PLLC APPLICATION FOR COMPENSATION (DKT. 123) AND IN
RESPONSE TO DJC'S RESPONSE (DKT. 136)**

NOW COMES Nicholas Wooten, by and through Nick Wooten, LLC, Special Counsel to the Chapter 7 Trustee, Alex Moglia ("Special Counsel" or "Wooten"), and replies in further support of his Objection to the Application for Compensation of DJC Law, PLLC ("DJC") (Dkt. 123) and in response to DJC's Response to that Objection (Dkt. 136), and states as follows:

**INTRODUCTION**

DJC's Response is not a defense of a fee claim; read closely, it is a demonstration that DJC has no lawful path to one. DJC has taken a series of positions—across two courts and six filings—that do not merely fail individually; they foreclose one another. Each escape route DJC opens leads directly into another legal barrier. Consider the logical construct DJC's flip-flopping has created: To reach § 330 compensation, DJC must be an employed § 327 bankruptcy professional; DJC swore to the district court it was not. To have standing to challenge bankruptcy professional compensation, DJC must hold a stake its own concessions extinguish. To seek a percentage-based fee, DJC must repudiate its own client-protective contractual break-up clause—a limitation Special Counsel authored and DJC voluntarily accepted—in violation of Seventh Circuit law prohibiting this very tactic. To recover a percentage-based fee, DJC asks this court to ignore ethical prohibitions in both Illinois and Texas—the only states whose law could apply. Its fallback is an attempt to deceive the court: reliance on a fifty-fifty clause in a superseded employment letter.

1

DJC advances this position knowing it cannot impose a fee split on a departed lawyer. The claim belongs to a pending Texas suit and was advanced only by concealing the superseding agreement DJC's own founder confirmed had deleted this clause DJC now argues. Finally, DJC argues a contingency fee may be granted under quantum meruit by right, but the Seventh Circuit says that zero is the proper payment to a terminated contingency fee lawyer who recovered nothing for the former client.

The Chapter 7 Trustee, the estate's fiduciary and the party the Code charges with evaluating the services rendered, has filed a position statement supporting Special Counsel's Application and confirming that this matter was litigated and settled under Wooten's uninterrupted representation (Dkt. 133). What follows addresses each of DJC's positions in turn laying bare the fatal flaws in each of DJC's numerous positions of convenience.

DJC's framing of this dispute does not change the analysis. DJC opens by recasting the matter as a contest over "which claimant" takes a single fund, urging that the estate is indifferent because the same dollars will be paid either way (Dkt. 136 ¶¶ 2–3). That is wrong twice over. First, the premise assumes DJC *can* be a claimant—an assumption the eligibility bar (Part I) and the ethical prohibitions (Part III) foreclose before any "which claimant" question is reached. Second, the estate is not indifferent: DJC's application seeks nearly $120,000 more than Special Counsel sought, so awarding DJC is not a wash but a net diminution of the estate (Part I.A); and DJC's adverse, fee-driven litigation has burdened the estate with delay and cost that its "single fund" framing simply ignores. The question is not merely who takes the fund, but whether DJC may take anything from this estate at all—and on every measure, it may not.

**ARGUMENT**

**I.**      **DJC Is Either Estopped or Ineligible Under § 330. It Manufactured the Choice, and Both Answers Are Fatal.**

1.   If the attorney is to be paid from estate funds under § 330(a)(1) in a chapter 7 case, he must be employed by the trustee and approved by the court. *Lamie v. United States Tr.*, 540 U.S. 526, 538-39, 124 S. Ct. 1023, 1032 (2004); *FTC v. Trudeau*, 845 F.3d 272, 274–75 (7th Cir. 2016) (firms representing the estate "can be compensated ahead of other creditors, but only if they receive the court's approval for their hiring and demonstrate that their activities are necessary and benefit the estate."). DJC's eligibility thus turns on a single question of status—and on that question DJC has already bound itself, in the district court, to the answer that defeats it here.

2.   Seeking to secure the district court's adjudication of its fee claim, DJC represented— and persuaded that court—that it was *not* a § 327 retained § 330 eligible bankruptcy professional. It told Judge Perry that its claim "does not seek allowance of fees as an administrative expense under 11 U.S.C. § 330, nor is it based on an appointment under § 327" (Dist. Ct. Dkt. 120-1), and it reaffirmed on reconsideration that it was "ineligible for Bankruptcy Code § 330 compensation because it was not employed under § 327" (Dist. Ct. Dkt. 130). The district court adopted that framing while still rightly recognizing that all questions of compensation belonged in the bankruptcy court in the first instance (Dist. Ct. Dkt. 128).

3.   DJC's voluntary position in the District Court is the first inescapable trap DJC sprung on itself. The dilemma is complete. **If** DJC now asserts § 327 status hoping to reach § 330 compensation, judicial estoppel bars it, because it prevailed on the opposite position in the district court. *New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001); *In re Cassidy*, 892 F.2d 637, 641 (7th Cir. 1990). **If** DJC maintains—as it has repeatedly—that it is *not* a § 327 professional, then *Lamie* bars its § 330 recovery outright. There is no third position.

4.   Despite the binary nature of the bankruptcy professional employment question, DJC's Response (¶¶ 7–9) claims a third position by recharacterizing *Lamie* to require only that services

be performed *during* a past period of authorized employment rather than during current employment. That gloss is not a third door; it is one more barrier. DJC seeks a contingency fee on a recovery that DJC had no role in securing. The Seventh Circuit has already rejected this argument in *Goyal v. Gas Tech. Inst.*, 718 F.3d 713, 719 (7th Cir. 2013)(hereinafter *"Goyal I"*). There, the Seventh Circuit rejected a fired contingency fee lawyer's claim of lien for a percentage of recovery that occurred after termination relying upon Restatement (Third) of Law Governing Lawyers § 35(2) (2000) ("Unless the contract construed in the circumstances indicates otherwise, when a lawyer has contracted for a contingent fee, the lawyer is entitled to receive the specified fee only when and to the extent the client receives payment."). *Goyal I* makes clear that contingency fees are earned by recovering funds for the client not by being terminated and claiming liens on a future settlement.

5. This dilemma is not an accident of litigation; DJC forged both its horns. It took the district-court position because DJC needed to disclaim § 327 status to maintain *any* argument the district court should rule on the question of compensation. A litigant may not take a position to purchase one forum's jurisdiction and then reverse that position in the next forum. Whichever horn DJC now grasps—estoppel or *Lamie*—it loses, and it has only itself to thank for the choice.

> **A.** **Even if the Court declines to apply judicial estoppel and treats DJC as a professional, § 328(c) forfeits DJC's fees for the adverse interest it took against the estate.**

6. Should the Court decline to apply judicial estoppel and instead entertain DJC as a professional employed under § 327, DJC confronts its next barrier. Analysis under § 327 fares no better, because that status subjects DJC to application of § 328(c)—and on this record, § 328(c) requires denial of any fees. Section 328(c) authorizes the Court to "deny allowance of compensation for services and reimbursement of expenses of a professional person employed

4

under section 327 … if, at any time during such professional person's employment … such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate." 11 U.S.C. § 328(c). The Seventh Circuit has confirmed that bankruptcy courts possess broad discretion to deny fees under § 328(c), and that the provision reaches a professional's adverse interest across "the entire duration of that person's employment." *Kravit, Gass & Weber, S.C. v. Michel (In re Crivello)*, 134 F.3d 831, 837 (7th Cir. 1998).

7. The Seventh Circuit has defined an "interest adverse to the estate" to include the possession or assertion of "any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant[.]" *Crivello*, 134 F.3d at 835.

8. DJC meets the definition of having an interest adverse to the estate. Beginning on October 5, 2024—the date Wooten departed DJC—DJC took an interest directly adverse to the Trustee and the estate (Ex. A, Wooten Departure Letter). Since then, DJC has asserted a claim to forty-five percent of the estate's settlement fund, making itself "a rival claimant" to the estate for the very dollars the estate recovered. It intervened in and against the estate's case, pursued ancillary litigation over its fee that impeded the resolution of the matter, lengthened the proceedings, and imposed additional costs on the estate—all in service of a recovery theory that conflicted with its own contract. Part IV herein explains that Wooten drafted the break-up clause in the DJC contract specifically to avoid precisely this kind of ancillary fee litigation that DJC so vigorously pursues. Further, DJC represented to the district court on April 3, 2025 that it was "not seeking a fee over and above what will be awarded to counsel in the case that was brought in the district court," and "not seeking anything over and above the amount that will be awarded to counsel." See, Ex. D-Dist. Ct. Dkt. 111, Apr. 3, 2025 Hr'g Tr. 12:25–13:6. Yet DJC filed a fee application here that

exceeds Wooten's claim by almost $120,000—precisely the "over and above" recovery DJC told the district court it would not pursue. Having represented that it would not seek more than the amount awarded to counsel, DJC may not now demand it here. Those are dollars burdening the estate that Wooten never sought. That request for amounts beyond the fee Wooten sought *is* an economic interest tending to lessen the value of the estate and an independently sufficient badge of adverse interest under *Crivello*.

9. Where such an adverse interest causes actual injury to the estate, denial of fees is proper, and the court should "lean strongly toward denial of fees," and, where the benefit can be quantified, toward disgorgement of compensation "even before the conflict arose." *Electro-Wire Prods., Inc. v. Sirote & Permutt, P.C. (In re Prince)*, 40 F.3d 356, 360 (11th Cir. 1994). DJC's conduct injured the estate in exactly the manner *Electro-Wire* contemplates: it prolonged the litigation, prolonged the administration of the estate, interfered with timely administration of the estate, and seeks to burden the estate with costs it would not otherwise have borne. The result is that DJC—if it is a professional at all—forfeits its compensation, and the estoppel and § 328(c) horns become two locks on the same door: either DJC is not a § 327 professional, in which case *Lamie* bars its recovery, or it is, in which case its adverse interest under § 328(c) forfeits it. The Seventh Circuit's *Crivello* standard is controlling; *Electro-Wire* is cited as persuasive authority for the actual-injury and disgorgement principles.

## II.   DJC Lacks Standing to Contest Special Counsel's Compensation, Because the Only Stake It Claims Is One Its Own Concessions Destroy.

10. Standing to be heard on the compensation of an estate professional requires a direct pecuniary stake in that question. *In re Andreuccetti*, 975 F.2d 413, 416 (7th Cir. 1992) (standing limited to those "directly and adversely affected pecuniarily," a standard "more exacting than" general Article III standing); *In re Teknek, LLC*, 2008 Bankr. LEXIS 2590, at *6 (Bankr. N.D. Ill.

6

Oct. 17, 2008) ([B]ankruptcy standing is much narrower than constitutional standing. *In re Cult Awareness Network, Inc.* 151 F.3d 605, (7th Cir. 1998). To have bankruptcy standing, "a person must have a pecuniary interest in the outcome of the bankruptcy proceedings." *Id*. "Only those persons affected pecuniarily by a bankruptcy order have standing[.]" *Id)*; *Peoples v. Radloff (In re Peoples)*, 764 F.3d 817, 820 (8th Cir. 2014)(Same). That stake belongs to the estate's professionals and to the creditors whose distributions such payments diminish.

11. A predicate point disposes of much of DJC's premise. In bankruptcy, special counsel is retained *by the lawyer*, not the firm. As the Trustee's general counsel explained on the record, "In bankruptcy, we retain special counsel by the lawyer, depending on which firm he's at. It will be Mr. Wooten at his new firm." Dkt. 48 (Tr. 21:11–14, Nov. 19, 2024); *see* Dkt. 108 ¶ 3. The retained bankruptcy professional throughout this case has therefore always been Wooten—through DJC, then Cheeley, then Nick Wooten, LLC—and DJC-the-firm has never been the professional whose compensation is at issue. DJC's repeated "wrong claimant" refrain inverts the rule: the lawyer is the constant, and the firm is not.

12. DJC is neither a professional (see Part I) nor a creditor of this estate. Its only asserted interest is an equitable claim to a share of the settlement fund. But a claimant's unadjudicated potential stake in a settlement *fund* does not equal standing to object to routine administration matters such as the distinct question of professional compensation under § 327.

13. DJC's "person aggrieved" authorities (Dkt. 136 ¶¶ 4–6) do not fill the gap. *In re Resource Tech. Corp.*, 624 F.3d 376 (7th Cir. 2010), and *In re Fondiller*, 707 F.2d 441 (7th Cir. 1983), recognize standing for a professional whose pecuniary interest is real and direct—not for a disputed claimant who disavowed the very status on which its interest would depend. DJC says Wooten "cannot have it both ways." But again, DJC fails to appreciate the nuance of its position

7

in this court. This court is undoubtedly the proper forum to decide DJC's claim of quantum meruit because DJC seeks a payment of fees from the estate. Simultaneously, DJC can also lack standing to interfere with the regular administration of the estate including the payment of estate professionals because DJC has no pecuniary interest in those questions. This is not having things two ways. Wooten is correct on both points, and there is no contradiction between the two.

14. Nor does DJC's previously asserted attorney's lien supply a stake. The settlement fund is property of the estate, and the automatic stay bars "any act to create, perfect, or enforce any lien against property of the estate," 11 U.S.C. § 362(a)(4), a bar that continues so long as the property remains property of the estate, id. § 362(c)(1). Any lien DJC attempted was an act barred by the stay and, absent relief DJC never sought, is void. *Middle Tenn. News Co. v. Charnel of Cincinnati*, 250 F.3d 1077, 1082 (7th Cir. 2001). And even if a lien existed, it could not be used to extract estate funds: where *Lamie* prevents payment from the estate to counsel not appointed under § 327, authorizing such payment on a state-law lien theory "is forbidden by the Supremacy Clause." *Morse v. Ropes & Gray, LLP (In re CK Liquidation Corp.)*, 343 B.R. 376, 384 (D. Mass. 2006) (reversing an award to professionals not employed under the Code—the very theory DJC advances). DJC's standing thus depends entirely on the § 327 status its own district-court concession destroyed. In effect, DJC argued itself into a losing corner.

## III.    DJC May Not Take a Share of Wooten's Fees at All—and It Conceded the Law That Says So.

15. Stripped of its labels, DJC's demand is a claim to a share of fees *Wooten* earned as Special Counsel. That is a fee division between a firm and a lawyer who left it. The professional-responsibility law of both jurisdictions whose rules could apply forbids it—as Special Counsel demonstrated at length in the Trustee's Consolidated Response, which showed that "applicable

8

laws governing the profession from both Texas … and Illinois … make clear that DJC cannot share in a contingency fee" (Dkt. 108).

16. Under Illinois law, *Albert Brooks Friedman, Ltd. v. Malevitis*, 304 Ill. App. 3d 979, 987 (1st Dist. 1999), holds that "Illinois public policy prohibits a discharged lawyer from receiving a percentage-based fee where said fee was not related to the value of services rendered, the client does not consent to the fee arrangement, and the discharged attorney has no responsibility for the pending litigation." Each condition is present: DJC seeks a percentage untethered to the value of its services, without the Trustee's or the Debtor's consent, and with no responsibility for the litigation after its termination. ISBA Professional Conduct Advisory Opinion 12-11 (May 2012) confirms that a discharged attorney may not share in a division of fees with successor counsel absent the client's written consent.[1]

17. This prohibition is clearer still under Texas law—and DJC concedes Texas governs its employment agreement with Wooten. That concession is the knockout, because Texas is the jurisdiction whose rule most flatly forbids exactly what DJC seeks. The Texas Disciplinary Rules of Professional Conduct carry the force of statute and expresses the State's public policy. *Whiteside v. Griffis & Griffis, P.C.*, 902 S.W.2d 739, 743 n.6 (Tex. App. 1995). Rule 5.06(a) prohibits any "partnership or employment agreement with another lawyer that restricts the right of a lawyer to practice law after the termination of a relationship," and *Whiteside* holds that a clause imposing a financial disincentive on a departing lawyer is "void as against public policy." *Id.* at 744. DJC's fifty-fifty split—by which the firm would claim half the fees a departed lawyer earns after leaving—is precisely such a provision. Texas Ethics Opinions 459, 590, and 699 construe Rule

---

[1] ISBA Prof'l Conduct Advisory Op. 12-11 (May 2012), available at https://www.isba.org/ethics/opinions/1211. Last viewed August 2, 2026.

5.06(a) to prohibit a firm from collecting a share of fees a lawyer earns after departure *even where the client elects to follow the departing lawyer*.[2]

18. The consequence is dispositive and inescapable. Because the fee-split DJC seeks is void under the public policy of *both* candidate jurisdictions, there is no forum in which DJC could lawfully obtain it. DJC chose to litigate under Texas law and concedes it governs; it thereby selected the law that most surely annihilates its claim. DJC has no legal right to any share of the fees Wooten earned. Its remedy, if any, lies against its former client—not against Wooten, and not against this estate. DJC has repeatedly disavowed this remedy both in writing and in statements in open court instead preferring to pursue Wooten despite the ethical prohibitions.

19. The same professional-responsibility law independently bars DJC's demand as an unreasonable fee sought contrary to the terms of DJC's own agreement. The Seventh Circuit has construed Rule 1.5 of the Rules of Professional Conduct to include "an implicit requirement that an attorney not assert unreasonable or baseless demands for attorney fees contrary to his fee agreement, including asserting a lien." *Goyal I*, 718 F.3d at 720–21; accord *Goyal v. Gas Tech. Inst.*, 732 F.3d 821, 826 (7th Cir. 2013) (hereinafter "*Goyal II*") (Rule 1.5 "prohibit[s] a lawyer from asserting unreasonable and baseless demands for a fee contrary to the terms of his fee agreement"). That is precisely what DJC does here. Its demand for forty-five percent of the estate's recovery is both unreasonable—unsupported by any contemporaneous time record and untethered to the value of any service DJC performed—and contrary to the terms of DJC's own agreement, which fixes its post-termination compensation at reasonable value and forecloses a contingency (Part IV). A fee demand that Rule 1.5 forbids cannot supply the "legal

---

[2] Tex. Comm. on Prof'l Ethics, Ops. 459, 590, and 699. Last viewed August 2, 2026.

right" to a percentage that DJC must establish, and it reinforces every other reason DJC's claim fails.

**IV.    DJC Is Bound by Its Own Client-Protective Break-Up Clause, Which Fixes Its Post-Termination Compensation and Forecloses Any Contingency.**

20. DJC's contingency engagement with the client did not leave DJC's post-termination compensation to a raw percentage; it fixed that compensation by a "break-up" clause—a provision DJC voluntarily accepted, and one Special Counsel authored precisely to protect clients from the overreaching DJC now attempts. As Special Counsel explained to this Court, the break-up clause "comes from Special Counsel's template consumer contract he has used in the Northern District of Illinois since at least 2014," and Special Counsel "provided this template to DJC for its use in consumer cases during his employment with DJC" (Dkt. 108 ¶ 8). It appears, identically, in every fee agreement executed in this case (Dkt. 108 ¶ 7 & n.1). DJC did not have this limitation imposed on it; DJC voluntarily agreed to it. And to the extent DJC contends the clause is ambiguous, that contention cuts against DJC, not for it: because a lawyer is responsible for drafting the fee agreement and its terms must be made clear to the client in advance, "ambiguities are usually resolved against the lawyer." *Goyal I*, 718 F.3d at 721 & n.3 (citation omitted). The client-protective reading of the break-up clause—the reading its drafter has consistently urged—therefore controls over the contingency reading DJC invents.

21. The clause governs DJC's rights to compensation upon termination, and it does so on terms DJC accepted in advance. As Special Counsel construed it of record, the clause "requires DJC to provide an accurate billing of its time and expenses and allows only that amount to be subject to an attorney's lien," and it "does not allow DJC to seek a contingency fee from its former client" (Dkt. 108 ¶ 9). That is how the clause was explained to the client and how it was meant to operate: on termination *without cause*, DJC's recovery is limited to the reasonable value of the

11

time it actually expended, subject to a lien for that amount—never a share of the contingency; on termination *for cause*, DJC is entitled to nothing. The clause thus supplies a clear, pre-agreed mechanism for determining DJC's compensation, and that mechanism yields reasonable value, not a percentage. The clause was designed to prevent this very type of ancillary fee litigation DJC incessantly pursues.

22. Critically, the clause is triggered *by* termination, by its own terms. It speaks directly to the event—the client's election to leave, the end of the employment relationship—and prescribes what DJC may recover when that event occurs. DJC's argument that termination "frees" it from its own contract is therefore backwards: termination does not dissolve this clause; termination is the very condition that *activates* it. A provision written to govern the parties' rights upon termination cannot be escaped by pointing to the termination it was written to address. Illinois law renders unenforceable, upon termination, the contingency mechanism. Nothing in Illinois law disturbs a pro-client clause meant to avoid litigation and conflict after a client terminates a law firm.

23. Because a governing contract fixes DJC's compensation upon termination, DJC may not repudiate that contract and resort to quantum meruit to better its bargain. DJC's own authority confirms the point: "It is well established, however, that actions in quasi-contract, such as *quantum meruit*, are precluded when there is an express contract between the parties regarding the work that was performed. Simply put, if an express contract exists between the parties concerning the same subject matter, a party cannot assert a claim on a contract implied in law." *Schroeder v. Sullivan*, 2018 IL App (1st) 163210, ¶ 46, 422 Ill. Dec. 893, 905, 104 N.E.3d 460, 472 (internal citations and quotations omitted). DJC cites *Schroeder* for the truism that quantum meruit is a distinct theory, but its holding cuts against DJC: because the break-up clause governs DJC's post-termination compensation, it forecloses a quantum meruit claim to exceed that measure. The

Seventh Circuit confirms that "Illinois construes attorney contingent fee agreements strictly in favor of clients in order to protect them from unscrupulous attorneys who might manipulate the agreement terms in their favor." *In re Solis*, 610 F.3d 969, 972 (7th Cir. 2010). *Solis* therefore forecloses DJC's attempt to pursue any recovery other than that allowed by the contractual breakup clause in the DJC agreement. DJC's dissatisfaction with the reasonable-value measure it agreed to is no reason to set that measure aside. Having accepted a contract that caps its post-termination recovery, DJC cannot discard the contract to reach a larger, contract-free percentage by attempting to repudiate its own contract.

24. Public policy compels the same result and confirms the clause survives the termination that makes it operative. The break-up clause is a client-protective, self-imposed limit on attorney compensation that *Solis* interprets strictly in favor of the clients. To hold that it dissolves upon termination would invert its purpose—releasing a terminated firm from its own promise not to overreach at the very moment the promise matters most while exposing the client's recovery to a *larger* claim than the firm ever bargained for. That reading cannot be right. It also aligns with the Illinois authority already before the Court: *Albert Brooks Friedman, Ltd. v. Malevitis*, 304 Ill. App. 3d 979, 987 (1st Dist. 1999), forbids a discharged lawyer from taking a percentage-based fee untethered to the value of services, without client consent, and with no responsibility for the litigation. The break-up clause is the contractual embodiment of that client-protective rule—DJC's own advance agreement to the very limit Illinois public policy imposes.

25. DJC, in short, accepted a pro-client clause Wooten had been using for years in its template consumer law contract that caps its compensation at reasonable value when terminated without cause and extinguishes it altogether when terminated for cause, then repudiated that clause to demand forty-five percent of the recovery. It may not discard its own voluntary, client-protective

13

limitation by invoking the very event—termination—the clause was written to govern. Its recovery, if any, is the reasonable value of services actually rendered—which, as shown below, it has wholly failed to prove.

## V.  DJC's Reliance on the Employment Agreement Is Barred, Belongs in Texas, and Betrays Its Bad Faith.

26. Unable to reach a percentage through its client contract, DJC turns to its *employment* agreement with Wooten, invoking a fifty-fifty "divorce clause" to claim a share of the fees Wooten earned. That reliance fails for three independent reasons, none of which requires this Court to construe the employment agreement's terms.

27. First, the fee-split is void as a device to capture a departed lawyer's fees. For the reasons set out in Part III, the professional-responsibility law of both Illinois and Texas—the state DJC concedes governs the employment agreement—prohibits a firm from collecting a share of the fees a lawyer earns after leaving. *See Whiteside v. Griffis & Griffis, P.C.*, 902 S.W.2d 739, 743–44 (Tex. App. 1995); Tex. Disciplinary R. Prof'l Conduct 5.06(a). A provision void as against public policy is not a source of entitlement, and DJC cannot resurrect it here.

28. Second, any remaining dispute over the employment agreement belongs to Texas, not to this Court. DJC has already sued Wooten in the District Court of Travis County, Texas (*DJC Law, PLLC v. Nicholas Wooten*, Cause No. D-1-GN-25-002983), over the employment relationship and the challenged loans and interest it now attempts to import into this proceeding. This Court need not, and should not, construe the parties' Texas employment contract to resolve a § 330 compensation question. The employment agreement is a matter between DJC and Wooten, pending in the proper forum; it supplies no basis for an award from this estate.

29. Third, and most tellingly, DJC's conduct surrounding the employment agreement is affirmative evidence of bad faith. To manufacture the appearance of a fee-split entitlement, DJC

14

filed the *superseded* December 27, 2023 employment letter—the one version that still contains the fifty-fifty divorce clause—while concealing the operative May 31, 2024 amendment that deleted it (Ex. C- Unredacted May 31, 2024 amendment). DJC knew better. Its own founder confirmed, in writing, that "the only real substantive change" in the amendment was that the "'divorce clause' where we set out how the fees would be split if the attorney left the firm" had been "removed," allowing Texas law to control, so that a departing attorney's clients "have the option to move to the lawyer leaving the firm, but the firm can maintain a lien for its fees and expenses" (Ex. B- Dan Christensen email). DJC itself, moreover, identified the May 31, 2024 amendment as the operative instrument when it suited DJC in the district court. DJC thus knew the operative agreement gave it no fee-split—yet filed the *superseded* one in this court to claim a fee-split.

30. That is not a good-faith contract dispute; it is a deliberate misrepresentation to this Court of an entitlement DJC knew did not exist. That conduct proves DJC knows it cannot prevail on the truth. DJC's employment-agreement theory is void where the ethics rules reach it, a Texas question where they do not, and, on this record, a demonstration of the very bad faith infecting DJC's fee demand.

## VI.     Zero Is the Proper Award: It Is Both Lawful Under Seventh Circuit Authority and Compelled by DJC's Own Choices on This Record.

31. When every other route closes, DJC is left with pure quantum meruit for the reasonable value of its services—and on that theory the Seventh Circuit has squarely held the answer may be zero. In *Goyal I*, the court rejected a discharged contingency-fee attorney's quantum meruit demand and awarded him nothing, holding that a contingent-fee attorney's recovery may be zero and that, where the attorney's work did not "secure" the client's recovery, zero is the correct result. As the Seventh Circuit reiterated in the companion sanctions decision, "[a]ttorneys who work on a contingent fee basis know that even though they may work long and hard, the fee may turn out

15

to be zero." *Goyal II*, 732 F.3d at 825. The court found the same contingency-to-quantum-meruit maneuver DJC attempts here so meritless that, in *Goyal I*, it deemed the position "unreasonable to the point of being frivolous." *Goyal I*, 718 F.3d at 720.

32. DJC's contrary authority does not rescue its claim; it defeats it. DJC leans on *In re Estate of Callahan*, 144 Ill. 2d 32 (1991), and *Andrew W. Levenfeld & Associates, Ltd. v. O'Brien*, 2024 IL 129599, for the proposition that a discharged contingency lawyer may recover the full contingency percentage as the reasonable value of its services. But those cases award the contingency measure only where the discharged firm's own work *produced the recovery before discharge*—and each turned on a factual record DJC cannot come close to matching. In *Levenfeld*, the discharged firms spent more than 3,000 hours over nineteen months, and the settlement the client accepted was reached fewer than sixty days after discharge on terms nearly identical to the offer the firms had already generated; on that record the trial court found their work "provided nearly all the leverage that consummated" the settlement. 2024 IL 129599, ¶¶ 8, 56. Critically, *Levenfeld* permits the contingency measure only as a discretionary valuation sustained under a manifest-weight standard, and only where the claimant offers evidence "sufficiently specific to prove the reasonable value" of the benefit—there, detailed time records and expert testimony supporting findings on each *Callahan* factor. *Id.* ¶¶ 59–61. DJC offers none of this: it kept no time records (Dkt. 123 ¶ 23), its after-the-fact reconstruction has been shown to be unreliable (Dkt. 125 ¶¶ 24–63), it presents no evidence that DJC-entity work produced the estate's recovery, and, critically, Wells Fargo had not even made an offer to settle at the time DJC was terminated from the case.

33. More fundamentally, the causation that *Callahan* and *Levenfeld* require is absent here, and the record forecloses it. In those cases, the discharged firm's pre-discharge work produced a

recovery that materialized almost immediately after discharge. Here, the sequence is the opposite. Wooten left DJC on October 5, 2024, and DJC's own reconstruction reflects no work after October 2, 2024. This Court terminated DJC as Special Counsel and substituted Cheeley as Wooten's new firm (continuing Wooten's employment) on December 10, 2024. The parties did not reach even an agreement in principle—expressly "subject to bankruptcy approval"—until February 24, 2025, months after DJC was out of the case (Dkt. 77). And most decisively, in a bankruptcy case there is no settlement at all until the Court approves it: no recovery existed until this Court entered its order approving the compromise under Federal Rule of Bankruptcy Procedure 9019 on June 2, 2026 (Dkt. 111)—roughly twenty months after Wooten's departure from DJC and eighteen months after DJC was terminated as Special Counsel. DJC's work thus could not have "produced," "secured," or "consummated" a recovery that did not come into legal existence until nearly two years after DJC's last recorded activity on the case. The value that the settlement represents was carried to approval through Wooten's uninterrupted representation at successor firms, which the Trustee has confirmed (Dkt. 133). *Callahan* and *Levenfeld* therefore point the other way: the contingency measure follows the firm whose work produced the recovery, and that firm was never DJC-the-entity. DJC's assertion that the February 24, 2025 agreement occurred "when Wooten was employed by DJC" (Dkt. 136 ¶ 13) is factually contradicted by this Court's own docket, which had already terminated DJC and substituted successor counsel more than two months earlier.

34. Zero is not merely permissible here; it is the proper and earned result, because DJC—by a sequence of deliberate choices—has foreclosed every measure that could yield more.

35. First, DJC bears the burden of proving the reasonable value of services that secured the estate's recovery. "The burden of proof to show entitlement to fees is, in all fee matters, always on the applicant." *In re Pettibone Corp.*, 74 B.R. 293, 299 (Bankr. N.D. Ill. 1987); *see also In re*

*Gilliam*, 582 B.R. 459, 465 (Bankr. N.D. Ill. 2018). As Special Counsel has already shown, "DJC has not and cannot make this threshold showing" (Dkt. 108). DJC has never even attempted to prove that *DJC-entity* or other employee work—as distinct from Wooten's—produced the estate's recovery.

36. Second, the settlement DJC claims credit for was reached long after DJC's involvement ended. The material terms were agreed on February 24, 2025, and DJC's own reconstruction shows no work of any kind after October 2, 2024. The Trustee, by contrast, has confirmed that this matter was litigated and settled under Wooten's uninterrupted representation (Dkt. 133). DJC thus seeks a percentage of a recovery it took no part in producing—the precise circumstance in which *Goyal I* holds that a contingency lawyer's efforts did not "secure" the funds and the fee may be zero. 718 F.3d at 720.

37. Third, DJC eschewed the one measure that could have produced a lawful, provable number—time expended multiplied by a reasonable rate under the break-up clause—disclaiming the contract precisely because that measure yields far less than forty-five percent. A claimant that rejects the only method capable of quantifying a legally supportable recovery cannot be heard to complain that no quantifiable recovery remains.

38. Fourth, DJC disabled its own proof. It admits it "does not maintain time records for contingency based cases" (Dkt. 123 ¶ 23), and its lone attempt to reconstruct hours is—by its own account—not a contemporaneous record and has been shown unreliable in every particular (Dkt. 125 ¶¶ 24–63): billed in impermissible quarter-hour increments, populated with entries for work that did not occur (a memorandum opposing a Wells Fargo summary-judgment motion that was never filed) or was performed by others, and reconstructed by an attorney with no knowledge of

18

the litigation. The Seventh Circuit has treated the absence of time records as itself fatal to a quantum meruit reasonableness showing. *In re Solis*, 610 F.3d at 974.

39. The reconstruction is decisive in one further respect DJC does not confront: on its face, it contains *no entry after October 2, 2024*. By DJC's own accounting, then, no one at DJC recorded a single minute of work on this matter in the nearly five months between early October 2024 and the February 24, 2025 settlement in principle. DJC thus affirmatively demonstrates, through its own records, that whatever produced the estate's recovery happened after DJC's involvement ceased—the precise *Goyal I* circumstance in which the departing lawyer's work did not "secure" the funds.

40. Fifth, DJC chose deception over proof. Rather than prove value, it filed a superseded contract and concealed the operative amendment that its own founder confirmed deleted the very clause DJC invokes here (Part V). A party that clings to a dead contract instead of proving live value has admitted by implication that its work had no value.

41. Sixth, the entity performed no compensable work independent of its people. DJC is a firm; people do the work; the person who did the work is the Court-appointed Special Counsel, whose value is captured in his own Application and his paralegal, whose work was paid as a case expense. There is no separate reservoir of "DJC-entity" value to compensate. Indeed, the work DJC's reconstruction points to is overwhelmingly *Wooten's* own—so paying DJC for it "would effectively charge the estate twice for Wooten's work" (Dkt. 125 ¶ 62). As Special Counsel has already shown of record, "DJC has no evidence … that anyone at DJC actually expended any time on this matter that contributed anything to the advancement of this case and its ultimate conclusion" (Dkt. 125 ¶ 61)—which is *Goyal I*'s "did not secure the recovery" standard, satisfied by DJC's own admission.

42. DJC's appeal to the "risk" it bore (Dkt. 136 ¶ 14) does not change the result; it confirms it. The defining feature of a contingent engagement is that the lawyer bears the risk of a zero recovery, and *Goyal I* holds that this risk falls on the lawyer who drafted the contingent terms, see 718 F.3d at 721 & n.3,—here, DJC. A firm that assumed the risk of zero cannot invoke that same risk to guarantee itself a percentage after it left the case. DJC did not stumble into zero. It estopped itself on eligibility, argued away its standing, conceded the law that voids its fee, repudiated the only contract measure that yields a number, destroyed its own proof, and concealed the operative agreement in an effort to deceive the Court. Each of those choices earned DJC nothing, and together they leave nothing to compensate. That result is not a penalty. *Goyal I* confirms that a contingency-fee lawyer whose efforts did not bring about the client's recovery may recover zero, and that zero is the correct application of the law—not a sanction, but the ordinary consequence of the contingent bargain DJC struck. 718 F.3d at 720 & n.3. DJC has proven the one thing its Response was meant to disprove: that it is entitled to nothing.

VII.    **DJC's Damages Table Is Self-Defeating and, In Any Event, Belongs in Texas.**

43. DJC's closing calculation (¶¶ 24–27) collapses on inspection. It applies the fifty-fifty split that the operative agreement deleted (Part V). It deducts a "loan repayment" of $229,673.78 and "interest" of $41,278.36 that are the subject of pending contested litigation in the District Court of Travis County, Texas (*DJC Law, PLLC v. Nicholas Wooten*, Cause No. D-1-GN-25-002983), where Wooten disputes the characterization of those payments and asserts counterclaims—an offset neither ripe nor within the § 330 question before this Court. And it misstates even its own premise, listing a "DJC Compensation Amount" of $512,796.35 while seeking $519,796.35 elsewhere in the same filing.

20

44. Whatever DJC and Wooten may ultimately owe one another under a Texas employment contract is a Texas contract question. It is not a measure of § 330 compensation, and it supplies no basis for an award to DJC from this estate.

## VIII.   DJC's Remaining Point Regarding Fee-Sharing Does Not Bear on Its Entitlement.

45. DJC's request that the "fee-sharing" issue be disregarded (¶ 22) fails at every level. First, the underlying premise is built on the deceit of the superseded employment agreement. DJC's theory that it may share in Special Counsel's fees rests entirely on the superseded December 27, 2023 employment letter—the same dead instrument, containing the fifty-fifty clause, that DJC filed while concealing the operative May 31, 2024 amendment that deleted it (Part V). Second, the claim ignores the ethical prohibitions that independently bar it. As shown in Part III, the professional-responsibility law of both Illinois and Texas forbids DJC from capturing any share of the fees a departed lawyer earns; DJC does not answer that law so much as step past it. Those prohibitions do not vanish because DJC declines to address them, and without a wholesale rewrite of that law DJC cannot lawfully reach these fees at all.

46. Third, and dispositively on the merits, Federal Rule of Bankruptcy Procedure 2016(b) forbids what DJC seeks. Rule 2016(b) requires disclosure of "whether the attorney has shared or agreed to share the compensation with any other entity," together with "the particulars of any such sharing or agreement to share." There has been no Rule 2016(b) disclosure of any sharing of compensation between Special Counsel and DJC, because there is no such agreement to disclose. DJC cannot impose a sharing of Special Counsel's fees upon him without running afoul of Rule 2016(b). Hard stop. Fourth, even if DJC could surmount all of the foregoing, the instrument it invokes for the task is a dead letter. Special Counsel resigned from DJC, and as of the date of his resignation the employment agreement conferred no continuing rights on DJC against him. A

21

terminated private employment contract cannot operate today as a live authorization for DJC to share in fees Special Counsel earned after that contract ended—and it certainly cannot authorize sharing of an estate professional's compensation that the Bankruptcy Code forbids absent disclosure and approval. DJC's fee-sharing theory thus rests on a deceitful premise, ignores the ethical bar, violates Rule 2016(b), and depends on a contract that gave DJC no rights the moment Special Counsel resigned. Nothing in it supplies DJC a claim to the fee.

## CONCLUSION

DJC has closed every lawful path to the recovery it seeks. It is estopped or ineligible under § 330—and if treated as a professional, its adverse conduct forfeits its fees under § 328(c); it lacks standing; the fee-split it demands is void under the law of both candidate jurisdictions, including the Texas law it concedes governs; it may not repudiate its own client-protective break-up clause to escape the reasonable-value measure it agreed to; its fallback on a superseded employment letter is barred, belongs to Texas, and betrays its bad faith; and on pure quantum meruit it has proven nothing, which *Goyal I* confirms yields zero. For these reasons, Special Counsel respectfully requests that the Court sustain his Objection, deny the DJC Application (Dkt. 123) in its entirety and grant such other and further relief as the Court deems just.

Respectfully submitted,

NICK WOOTEN, LLC

By: /s/ Nick Wooten

Nicholas H. Wooten

NICK WOOTEN, LLC
3125 Carlton Road
Cumming, GA 30041
833-937-6389
nick@nickwooten.com
Special Counsel to the Chapter 7 Trustee

22

## CERTIFICATE OF SERVICE

I, Nick Wooten, an attorney, certify that I served a copy of the foregoing document on each party shown on the following Service List by the method shown thereon on August 2, 2026.

*/s/ Nick Wooten*

Special Counsel for the Trustee

## SERVICE LIST

*ECF Service:*

Adam G. Brief
Office of the United States Trustee
219 South Dearborn, Room 873
Chicago, IL 60604

*Counsel for the U.S. Trustee*

Alex D. Moglia, Trustee
Moglia Advisors
1325 Remington Rd., Ste. H
Schaumburg, IL 60173

Thomas E. Springer
Springer Larsen, LLC
300 South County Farm Road, Suite G
Wheaton, IL 60187

*Counsel for Trustee Alex D. Moglia*

Carrie V. Hardman
Winston Taylor
200 Park Avenue
New York, NY 10166

*Counsel for Wells Fargo Bank, N.A.*

Rusty A. Payton
Payton Legal Group, LLC
20 North Clark Street, Suite 3300
Chicago, Illinois 60602

*Counsel for the Debtor*

Thomas W. Toolis
Jahnke, Sullivan & Toolis, LLC
10075 West Lincoln Highway
Frankfort, IL 60423

*Counsel for the Debtor*

Gregory K. Stern
Dennis E. Quaid
Monica O'Brien
Rachel S. Sandler
Gregory K. Stern, P.C.
53 West Jackson, Suite 1442
Chicago, IL 60604

*Counsel for DJC Law, PLLC*

All creditors on the matrix

***Via email service upon the following***:

Andrea D. Williams, Debtor